MISSISSIPPI RIVER AND BONNE TERRE RAILWAY, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 84282.   Promulgated May 24, 1939.

*James M. Chaney, Esq.*, for the petitioner.
*W. H. Schwatka, Esq.*, and *J. Y. Porter, Esq.*, for the respondent.

996

OPINION.

OPPER: Petitioner, an almost wholly owned subsidiary of the Missouri-Illinois Railroad Co., resists respondent's determination of a deficiency as to it, which is the result of certain adjustments made by respondent in the net income of petitioner's parent corporation. Petitioner and its affiliate filed consolidated returns.

The issues are three: First, whether under the circumstances respondent was entitled to assert against this petitioner, which had, by itself, no taxable net income, a deficiency arising as a result of the net income of its parent; second, whether the loss on the sale of a building owned by petitioner but leased under a long term general lease to its parent was deductible either by the parent or by petitioner; and, third, whether items of depreciation on the leased property generally may be deducted by either this petitioner or the parent lessee. For convenience of discussion the issues stated will be treated in inverse order.

In our view the precise question raised as to depreciation has been ruled upon. In *Atlantic Coast Line Railroad Co.*, 31 B. T. A. 730, both the lessor and lessee were before the Board in a consolidated proceeding. It was determined that the lessee there was not entitled to deduct for depreciation because it had no capital investment in the property or the lease, and that such deductions were not available to the lessor because the obligation of the lessee was to redeliver the property at the end of the lease in its original condition. The decision was affirmed at 81 Fed. (2d) 309, certiorari being denied, 298 U. S. 656.

Petitioner objects to the result so reached on the ground that "from every principle of right and justice, allowance for this depreciation should be made to one or to the other member of the affiliated group. The cars and other units of equipment are depreciating each year, exactly the same as are similar units of equipment owned by any other railroad where no lease is involved." A similar contention in *Atlantic Coast Line Railroad Co.*, *supra*, was characterized as "more apparent than real" and answered by a quotation from *Terre Haute, Indianapolis & Eastern Traction Co.*, 24 B. T. A. 197, 212, as follows:

"And the lessee, when it makes good the loss, is entitled to deduct the entire amount so expended either in the year in which made (if an ordinary repair), or (if a capital item), over the life of the property replaced or remaining term of the lease, whichever is shorter. In that manner the lessee will have returned to it its entire cost of maintaining the property which it is

entitled to deduct, and the lessor, at the end of the term, will receive back its property or its equivalent in value in as good a condition and value as when leased."

It is urged further that the cases cited are distinguishable on two grounds. First, because petitioner is almost wholly owned by the lessee; and, second, because the terms of the lease require that the lessor reimburse the lessee for expenditures of maintaining the property.

To support the first distinction petitioner cites *Southern Pacific Co.* v. *Lowe*, 247 U. S. 330. In our view, however, the doctrine of that case is inapplicable here. There, as the Supreme Court's opinion points out, "The Central Pacific and the Southern Pacific were in substance identical because of the complete ownership and control which the latter possessed over the former as stockholder *and in other capacities*. While the two companies were separate legal entities, yet in fact, and for all practical purposes they were merged, the former being but a part of the latter, acting merely as its agent and subject in all things to its proper direction and control. And, besides, the funds represented by the dividends [the ownership of which was the subject of dispute] were in the actual possession and control of the Southern Pacific as well before as after the declaration of the dividend." [Emphasis added.]

Here the separate identity of the two corporations has been meticulously preserved, not only as to their separate existence, but as to their reciprocal rights and obligations. The indenture of lease which gives rise to the present question is a printed document covering 27 pages and dwelling with repeated emphasis upon the several rights and liabilities of the parties. It is even provided (article three, section 3) that "The Lessor, at the expense of the Lessee, shall and will during the continuance of this lease, subject to the provisions of Section 7 of Article 5 hereof, maintain, and, if necessary, from time to time, renew, its existence and organization as a body corporate, in due form of law * * *." The section referred to (article five, section 7) permits the consolidation or merger of the lessor and the lessee. But the very presence of that provision negatives the intention of the parties that they be regarded as already merged for practical purposes. It is further stipulated in the "*habendum*" clause that the lease shall not operate to grant or demise "any other right, privilege or franchise which is or may be necessary to fully preserve the corporate existence or organization of the Lessor." And (section 1, article two) it is also provided that the lessee will pay the lessor the sums necessary "for the maintenance of its corporate organization, including the salaries of any necessary officers or compensation of its Board of Directors and for other expenses of administration * * *."

We can not disregard for the purposes of this proceeding the separate corporate organization of the parties which they themselves have so carefully preserved and emphasized. The income tax returns for the relevant years were not made as one organization but as two. For all that appears some advantage may have been anticipated in this respect by petitioner and its affiliate. In any event, these corporations have chosen to operate separately in so far as the relationship here material is concerned, and no assumption that in certain instances the existence of corporate entities may be disregarded seems to us to require that for the benefit of the corporation itself we overlook a separation upon which in their own relations both parties have been insistent.

Nor are we able to concur in petitioner's contention that a construction of the lease places upon it the cost of upkeep of the property. The provisions are essentially similar to those appearing in *Atlantic Coast Line Railroad Co.*, *supra*. With reference to sections 11 and 12 of article two of the present lease, quoted at length in our findings of fact, petitioner itself concedes in its brief "* * * if the lessee should regard the replacement of the equipment as essential to the maintenance of the value of the property for lessor's purposes (as would appear most natural), and return the property at the expiration of the lease with equipment in as good condition as that found at the beginning of the lease, lessor would, under the provisions of the lease above quoted, sustain no damage by reason of the annual depreciation."

Petitioner contends, however, that other provisions, particularly section 9 of article three, require that repairs and replacements be made at the expense of the lessor. We can not agree. Examination of the lease makes it apparent that the section last mentioned refers only to additions and extensions and not to maintenance or replacement of existing properties. In the earlier section the obligation of the lessee is spoken of as "retiring, replacing or renewing." No similar words are used in section 9, but the reference there is to "additions, betterments, improvements and extensions" and to the acquisition or construction of "new or additional lines of railway." And it is only for the latter class of expenditures that the lessor is required to reimburse the lessee, presumably on the theory that such extensions and betterments become the lessor's property, as would appear to follow from the general statement at the beginning of section 9 that such action is "for the account of the Lessor."

Most significant of all is the reimbursement provision itself, which states that the lessee is to be repaid "For all capital expenditures made by the Lessee with respect to the demised property for any of the purposes heretofore enumerated in this Section 9 or in Sections 5, 6

or 8 of this Article Three or in Section 5 of Article Two or in Section 4 of Article Five hereof * * *." There is no reference to sections 11 and 12 of article two, which are the sections requiring the lessor to maintain the demised property.

Being unable to conclude that the lease requires the lessor to sustain the expense of maintaining the property in its original condition, we can not follow the petitioner to the conclusion that in this case the economic loss resulting from depreciation falls on the lessor; and, that being so, we see no ground for distinguishing the cases cited above.

It does not follow from what has been said, however, that petitioner is not entitled to a deduction for the loss occasioned upon the sale of its building. It is true this also was covered by the lease. But "no use was contemplated" for it and it was sold at an admitted loss. We think this issue is controlled by the principle of *Commissioner* v. *Providence, W. & B. R. Co.*, 74 Fed. (2d) 714, affirming a memorandum decision of this Board. There (page 716), "Although the assignee is bound generally to maintain the leased property in good condition and to return equal value at the end of the term", there was an exception for "such portions and parcels of the real estate and property not required by the lessee for railroad purposes." Here also the lessee is given power "to sell, lease or otherwise dispose of any part of the demised property" with the proviso "in every case that the exercise of any of the rights above set forth in the judgment of the lessee shall not decrease the value of the demised property as a whole for railway purposes." And in the event of a sale the proceeds "shall be applied by the lessee at its option either to a reduction of any outstanding obligations or indebtedness of the lessor or to betterments or improvements upon or additions to the demised property" for which under other provisions of the lease the lessor was obligated to pay.

Speaking of the property sold in the *Providence, W. & B. R. Co.* case, *supra*, the court said: "When they were sold the only proceeds the respondent could ever receive were limited to the sale price and the only obligation of the assignee was to account to the respondent for that. The difference between that and the cost which the respondent had paid was an absolute loss." We think the same conclusion follows here.

This is not inconsistent with our holding on the previous issue, but in effect follows logically from it. To quote again from *Commissioner* v. *Providence, W. & B. R. Co.*, *supra*:

This loss occurred entirely in the year when the property was sold in accordance with the sixth paragraph of the lease. While the generators remained a part of the leased property, the assignee's obligation to return equal value at the termination of the lease continued and prevented any deduction by

the respondent for depreciation. *Weiss* v. *Weiner*, 279 U. S. 333. * * * During this time no lessening in the value of the generators became its financial burden. But, when the provisions of the sixth paragraph were invoked and the generators were sold in accordance with those provisions, the respondent was no longer protected by the obligation of the assignee of the lease to return their value in full, and the loss determined by the sale became the respondent's loss. It then was deductible. * * *

Finally, there is the question of respondent's authority to collect from this petitioner a deficiency in tax for the affiliated group arising by reason of income of the parent and not of the subsidiary involved in this proceeding.

This question was decided adversely to petitioner's contention in *Pacific Coast Biscuit Co.*, 32 B. T. A. 39, 45, in the following language:

Finally, petitioners question the propriety of the respondent's action in asserting a deficiency against each of them. The deficiency, it appears from the pleadings, arises from adjustments of income of the parent, Pacific Coast Biscuit Co. This action is in accordance with article 15 of Regulations 75, which provides that the parent and each subsidiary "shall be severally liable for the tax (including any deficiency in respect thereof) computed upon the consolidated net income of the group." The subsidiaries each executed and filed a Form 1122 in which they unqualifiedly consented to the regulations. * * *

Here also this petitioner executed form 1122,[1] one effect of which was that of "consenting to these regulations." [2]

Section 141, Revenue Act of 1932, provides, as did the comparable provision of the 1928 Act, for the assessment and collection of the tax due on a consolidated return in accordance with respondent's regulations. These regulations [3] require that "each subsidiary, a member of the affiliated group during any part of a consolidated return period, shall be severally liable for the tax (including any deficiency in respect thereof) computed upon the consolidated net income of the group." "The making of the consolidated return constituted acceptance by petitioner and its subsidiaries of the regulations that had been prescribed." *Charles Ilfeld Co.* v. *Hernandez*, 292 U. S. 62, 65.

Petitioner attacks the validity of the regulation. To this it may not only be answered that the filing of the consolidated return "was a voluntary act on their part and they will not be heard now to complain of the consequences", *Pacific Coast Biscuit Co.*, *supra;* but in addition, Regulations 78, issued under the 1932 Act, was in the respect

---

[1] The deficiency letter introduced by petitioner as proof of the facts therein contained includes among the "returns examined" the statement:

| | Form | Year |
|---|---|---|
| "Subsidiary Company: Mississippi River & Bonne Terre Rwy., 210 North 13th Street, St. Louis, Mo_____ | 1122 | 1932" |

A similar statement appears for the year 1933.

[2] Regulations 78, art. 12 (b).

[3] Regulations 78, art. 15 (a).

here material identical with Regulations 75 governing the years 1929 through 1931 under the 1928 Act. The reenactment in the Revenue Act of 1932 of the provisions appearing in the 1928 Act, with the intervening establishment by means of the regulation of the liability here contested, is a persuasive evidence of Congressional approval. *McFeely* v. *Commissioner*, 296 U. S. 102, 108.

The action of the respondent is sustained as to the depreciation issue and overruled on the question of loss to petitioner upon the sale of the building.

*Decision will be entered under Rule 50.*